UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SEMI-MATERIALS CO., LTD.,       )
                                )
            Plaintiff,          )
                                )
      v.                        )    No.  4:06CV1426 FRB
                                )
MEMC ELECTRONIC MATERIALS, INC.,)
et al.,                         )
                                )
            Defendants.         )

**MEMORANDUM AND ORDER**

Presently pending before the Court is plaintiff Semi-Materials Co., Ltd.'s Motion to Enforce Settlement (filed January 29, 2008/Docket No. 46). All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

Plaintiff Semi-Materials Co., Ltd. ("Semi-Materials"), brings this action against defendants MEMC Electronic Materials, Inc., and MEMC Pasadena, Inc. (collectively "MEMC"), alleging that defendants' actions in procuring and then failing to perform on certain contracts constituted fraud and breach of contract from which plaintiff argues it is entitled to compensatory and punitive damages.[1] Plaintiff also contends that defendants were unjustly enriched by their conduct and that plaintiff is therefore entitled to restitution. Finally, plaintiff contends that the unique and

---

[1]The specific facts underlying this dispute are set out in this Court's Memorandum and Order entered June 26, 2007, and will not be repeated here.

special nature of the product at issue here justifies the remedy of specific performance as well.[2]

Subsequent to the filing of MEMC's Answer to plaintiff's Amended Complaint, and pursuant to this Court's Case Management Order, this cause was referred to Alternative Dispute Resolution-Mediation and such mediation occurred on November 9, 2007. Thereafter, on November 20, 2007, designated neutral William Corrigan notified the Court that the parties achieved a settlement at the mediation conference. (See Docket No. 40.) In light of the reported settlement, the Court passed the matter for settlement to December 21, 2007. After the parties requested and were granted additional time to secure the dismissal of the cause as ordered by the Court, they then filed a "Joint Submission of the Parties' Respective Statements on Settlement" in which the parties informed the Court of their disagreement as to whether a settlement had indeed been reached. (See Docket No. 44.) Plaintiff's instant Motion to Enforce Settlement followed. Inasmuch as the instant litigation remains active and pending before this Court, this Court possesses the inherent authority to summarily enforce an agreement to settle the case. See Wilson v. Wilson, 46 F.3d 660, 664 (7th Cir. 1995), and cases cited therein.

In this diversity case, the parties agree that Missouri

---

[2]In its original and amended complaints, plaintiff also raised a claim of conversion. This claim has previously been dismissed by the Court.

law is applicable to the present settlement dispute. Settlement agreements are governed by contract law. Visiting Nurse Ass'n, St. Louis v. VNAHeathcare, Inc., 347 F.3d 1052, 1053 (8th Cir. 2003) (applying Missouri law). In Missouri, a party seeking specific performance of a settlement agreement bears the burden of demonstrating the existence of the agreement by clear, convincing and satisfactory evidence. Id.; Vulgamott v. Perry, 154 S.W.3d 382, 388 (Mo. Ct. App. 2004); B-Mall Co. v. Williamson, 977 S.W.2d 74, 77 (Mo. Ct. App. 1998). For a settlement agreement to be enforceable, the parties must have reached agreement on the essential terms of the deal. Kenner v. City of Richmond Heights, Mo., 356 F. Supp. 2d 1002, 1007 (E.D. Mo. 2005). Even if the parties may have left some details for counsel to work out through further negotiation, a legal, valid settlement agreement still exists. Id. at 1008. The absence of a signed, written agreement in itself does not imply that no agreement has been reached. Visiting Nurse Ass'n, 347 F.3d at 1054. Instead, any intent not to be bound in the absence of such a writing must be clear. Id. ("the law will not imply the necessity of a writing simply because the parties clearly intend to memorialize their agreement later."); see also Byrd v. Liesman, 825 S.W.2d 38, 39 (Mo. Ct. App. 1992) (settlement agreements need not be in writing; courts may enforce oral settlement agreement that contemplates a release being signed later). As such, the lack of a written, signed agreement does not

affect the agreement's enforceability unless the parties' intent not to be bound in the absence of such a writing is clear. <u>Visiting Nurse Ass'n</u>, 347 F.3d at 1054.

A. <u>Relevant Facts</u>

In this cause, the following facts are not in dispute:

Mediation occurred between the parties on November 9, 2007, at which extensive negotiations were had and a handwritten "Term Sheet" containing proposed terms of a business agreement was prepared and reworked throughout the mediation conference. At the end of the conference, a settlement had not been reached, but the parties determined to nevertheless continue with settlement negotiations. Thereafter, plaintiff's counsel, Greg Hansel, prepared a legible version of the handwritten offers and counteroffers that had been exchanged during mediation and forwarded a typewritten version of such to defendants' counsel, Mark Leadlove, on November 15, 2007. On November 20, 2007, Mr. Leadlove e-mailed to Mr. Hansel a "revised proposed Settlement Term Sheet" and included in this e-mail lengthy explanations of MEMC's position and clarifications regarding their changes to the Term Sheet, which included matters involving monetary interest, pricing for future shipments, movement of amounts of goods, quantity of goods to be shipped, right of first refusal, and shipment dates. (Pltf.'s Exh. B.) Mr. Leadlove concluded this e-mail with the following:

> Timing.  Much like Semi-Materials, MEMC does not want this to drag out.  The parties either need to agree now on these settlement terms, or not agree, and proceed with the lawsuit.  As a result, I have been instructed to advise Semi-Materials that this settlement offer is MEMC's last offer, and that the offer will remain open until 5:00 p.m. on Friday, November 23, 2007.  While I will not be in the office on Thursday or Friday, I will have my Blackberry, and we can indicate assent to the Term Sheet via e-mail as needed.  Obviously, thereafter we would need to commence drafting the actual Settlement Agreement (said differently, we are not expecting to have the Settlement Agreement drafted and signed by November 23; just agreement on this Term Sheet).  Obviously, any Settlement Agreement would need to include broad releases, including releases broad enough to capture not only the disputes raised by the allegations in the Amended Complaint, but other matters Semi-Materials has raised regarding relationships between Semi-Materials and MEMC and SMC Shanghai and MEMC.

(Id.)

On November 22, 2007, Mr. Hansel informed Mr. Leadlove of Semi-Materials's acceptance of MEMC's offer:

> Semi-Materials hereby accepts MEMC's settlement offer.
>
> This is not a condition of Semi-Materials' acceptance, but Semi-Materials asks whether MEMC could ship around 30 tons of this quarter's allocation before December 18.
>
> Let's get to work on the formal settlement agreement.  Would you be willing to prepare the first draft?

(Pltf.'s Exh. C.)

On that same date, Mr. Leadlove responded: "Thanks Greg. I will check on the delivery. I will prepare the first draft of the formal agreement." (Pltf.'s Exh. D.)

The "Proposed Settlement Term Sheet" attached to Mr. Leadlove's November 20th e-mail, and accepted by Semi-Materials on November 22, 2007, recites the following:

<u>Proposed Settlement Term Sheet</u>

1. Return of $5.1 million + interest at 5% from November 28, 2005 (date by which MEMC had informed Semi of the cancellation of the P.O.s) until June 26, 2006 (date MEMC offered, in writing, to pay back the $5.1 million).

2. 50 MT/Q starting Q407 until Q308 for total of 200MT virgin poly, min. 10 MT/Q PX (chunk poly). Price is Q407 $370/kg; remaining quarter's price for Q108-Q308 is lower of (a) $370/kg or (b) MEMC market price as determined by agreement or audit per below procedure; provided, however, that for MEMC market prices above $389.47, price to Semi is 95% of such MEMC market price. Except for the Q407 shipment, up to 25 MT of any quarterly shipment for the Q108-Q308 period may be deferred to a later quarter or moved into an earlier quarter at MEMC's option. In addition, for Q408-Q309, Semi has the right of first refusal (RFR) of any MEMC spot market sales of virgin poly up to 30 MT per quarter (for a total of 120 MT over the four quarters) at MEMC market price subject to audit.

3. Make current shipment of silane gas due SMC Shanghai.

4. No further cash payment by MEMC to Semi.

5. Attached terms & conditions.

6. MEMC will not agree to a right of first refusal on

silane.

7. MEMC Market Price audit procedure: Parties agree on a neutral Chicago CPA auditor by December 15, 2007. If fail to agree, stipulate that Judge Buckles appoint special master Chicago CPA by January 15, 2008. Auditor paid by party claiming price is different and loser pays (e.g. so if Semi says price is different, and is wrong, Semi pays, and if Semi is correct, MEMC pays and vice versa). Auditor to determine market price of MEMC sales as established by consummated sales to other spot customers using comparable quantity sales (or where not comparable quantity sales, sales of at least 5 MT). MEMC to provide redacted invoices to Semi in time to decide whether to challenge MEMC market price. Auditor to determine MEMC market price as of middle month of each quarter if parties are unable to agree by 15th of middle month of each quarter. Auditor to make determination by 15th of last month of quarter if parties do not agree. Auditor determination binding on parties without recourse. Parties may submit materials for auditor to consider by last business day of second month of quarter.

Terms & Conditions

1. Ex Works
2. Cash up front
3. Any shortage in shipment weight credited to Semi Materials by credit memo. Semi still has right to purchase shortfall in next shipment.
4. Except as otherwise provided in this Term Sheet, MEMC terms and conditions apply. First 200 MT of virgin poly for Q407-Q308 noncancelable. Except as provided in the right of first refusal, as to the 120 MT of virgin poly in Q408-Q309, all MEMC terms & conditions apply.
5. Missouri law applies, without regard to Missouri choice of law rules.
6. Enforcement by USDC EDMo. Court retains jurisdiction to enforce until all performance is complete.
7. Mutual general release of all claims except to enforce settlement agreement.
8. Entire agreement. Any amendment in writing signed

by both parties.  Parol evidence inadmissible.
   9.   Nonwaiver of enforcement.
   10.  Non-assignable without consent in writing signed by
        both parties.
   11.  Shipment by last day of quarter, including Q407.

(Pltf.'s Exh. A.)

On November 30, 2007, Mr. Leadlove submitted a first draft of the proposed Settlement Agreement to Mr. Hansel. (Defts.' Exh. 1.)  Thereafter, various redrafts of the proposed Settlement Agreement were prepared and exchanged between counsel with discussions between counsel revolving around the timing of Semi-Materials's payment for the December 31, 2007, shipment. (Defts.' Exhs. 2-18.)  On December 26 and 27, 2007, Semi-Materials wired pre-payments to MEMC for the December 31, 2007, shipment of material(s) in accordance with invoice instructions provided by MEMC in mid-December. (Hansel Decl. at para. 12.)  On December 26, 2007, Mr. Leadlove informed Mr. Hansel that MEMC would be unable to "complete the transaction for the Fourth Quarter of 2007" as contemplated by the proposed revised settlement agreement due to "various issues that had arisen." (Leadlove Decl. at para. 23.)[3] Accordingly, Mr. Leadlove informed Mr. Hansel that additional funds

---

[3]Mr. Leadlove declares that he had been informed by MEMC that production issues caused there to be insufficient granular polysilicon to complete the transaction, but that he was guarded in his conversation with plaintiff's counsel regarding such issue inasmuch as he felt information regarding MEMC's inability to reach certain production targets could have been considered material, non-public information regarding a company whose stock is publicly traded. (Leadlove Decl. at para. 23.)

should not be wired to MEMC. (Id.)

In an e-mail dated December 28, 2007, Mr. Hansel informed Mr. Leadlove that Semi-Materials considered MEMC to have failed to comply with the terms of the Term Sheet which Semi-Materials considered to be an enforceable settlement agreement. Mr. Hansel further informed Mr. Leadlove that Semi-Materials had complied with its own obligations under the Term Sheet and that MEMC's failure to do so would cause Semi-Materials to suffer substantial and irreparable harm. As such, Mr. Hansel informed Mr. Leadlove that Semi-Materials considered MEMC to have breached the Term Sheet. (Pltf.'s Exh. E.)

B. Discussion

An enforceable settlement agreement was created on November 22, 2007, by Semi-Materials's unconditional acceptance of MEMC's "last offer" which was extended on November 20, 2007.

Mr. Leadlove's e-mail to Mr. Hansel on November 20, 2007, was unequivocal in its statement that the Proposed Settlement Term Sheet constituted MEMC's last offer of settlement to Semi-Materials, and that such offer remained open until 5:00 p.m. on November 23, 2007. The e-mail also made it clear that a written settlement agreement was not expected to be completed by such time and all that needed to be agreed upon were the settlement terms proposed in the Term Sheet. Although releases were not included in the Proposed Settlement Term Sheet and it was expressed that such

would need to be included in the written settlement agreement, the absence of these releases does not defeat the enforceability of the agreement. See Visiting Nurse Ass'n, 347 F.3d at 1054; Kenner, 356 F. Supp. 2d at 1007-08; Byrd, 825 S.W.2d at 39. This is especially true here where a deadline for acceptance of the offer's terms was put in place and such acceptance was timely and unconditionally made with all parties acknowledging that a future writing would include language regarding releases. Contrary to defendants' argument, there is no indication whatsoever that this e-mail and the Proposed Settlement Term Sheet attached thereto were merely a preliminary step to further negotiation on material terms. Nor is there any indication that a settlement agreement would be conditioned upon any future event. Indeed, Mr. Leadlove indicated in this e-mail that if the terms proposed in the attached Proposed Settlement Term Sheet were not agreed upon "now," then this present lawsuit would go forward.

This circumstance also belies defendants' contention that counsel did not regard the Proposed Settlement Term Sheet to constitute a settlement agreement, even if agreed to. To determine whether there was a meeting of the minds between the parties, the Court is to look to the intentions of the parties "as expressed or manifested in their *actual words or acts* and not upon the understanding or supposition of one of the parties." L.B. v. State Comm. of Psychologists, 912 S.W.2d 611, 617 (Mo. Ct. App. 1995)

(emphasis added).  Contrary to defendants' assertion, the actual words and acts here of Mr. Leadlove on November 20 and 22, 2007, show that he regarded the Proposed Settlement Term Sheet to constitute the material and essential terms of a settlement of this cause which had to be agreed to before 5:00 p.m on November 23, 2007.  Mr. Leadlove's accompanying caveat that the absence of such an agreement by such time would result in the continued litigation of the instant cause of action is incongruous with defendants' present position that additional material terms needed further negotiation beyond the stated deadline.

As indicated by Mr. Leadlove's e-mail, all that was required for a settlement to be reached was an agreement on the "settlement terms" contained in the Proposed Settlement Term Sheet by 5:00 p.m. on November 23, 2007.  Such event occurred.  Although Mr. Leadlove recognized the "obviousness" that a written settlement agreement would need to be subsequently drafted if Semi-Materials accepted MEMC's offer and that releases would be included in such writing, there is no clear intent, either expressed or implied, that the parties would not be bound by the terms of the agreement in the absence of a signed writing.  As such, this Court will not imply that the absence of a signed writing negates the enforceability of the agreement reached by the parties on November 22, 2007.  <u>Visiting Nurse Ass'n</u>, 347 F.3d at 1054; <u>Byrd</u>, 825 S.W.2d at 39.

Defendants also argue, however, that the parties' conduct subsequent to November 22, 2007, shows them not to have considered an enforceable agreement to have been reached inasmuch as terms and conditions different from and/or in addition to those included in the Term Sheet were included in the various drafts of the proposed Settlement Agreement exchanged between the parties. Defendants contend that given the substantive nature of such proposed changes, it is apparent that plaintiff did not consider the Term Sheet to constitute a final agreement. However, "'[a] contract is the agreement . . . parties [make] and not the writing which evidences the agreement.'" Vulgamott, 154 S.W.3d at 392 (quoting Bailey v. Jamestown Sch. Dist. No. 11, 77 S.W.2d 1017, 1020 (Mo. Ct. App. 1934)). Disagreements as to the language used to memorialize the agreement or whether such language conformed to the intent of the parties when they reached the agreement is an insufficient basis upon which to reject the parties' original agreement. Id.

Upon review of the course of negotiations between the parties up to and including November 22, 2007; the unambiguous language of Mr. Leadlove's November 20th e-mail that the matters contained in the attached Proposed Settlement Term Sheet constituted MEMC's "last offer"; that such "settlement terms" had to be accepted by 5:00 p.m. on November 23, 2007, or that the litigation of the matter would proceed; the acknowledgment that a written agreement could not be completed by such time and that

releases would be included in the future draft of the written agreement; and Semi-Materials's timely and unconditional acceptance thereto, it cannot be said that the parties did not intend the specific, unambiguous and agreed to terms of the Proposed Settlement Term Sheet not to constitute a binding settlement agreement. See Caleshu v. Merrill Lynch, 737 F. Supp. 1070, 1086 (E.D. Mo. 1990) (to determine whether parties intended to be bound by settlement prior to execution of written documents, court must consider course of negotiations, agreement on material terms, whether parties described the settlement as such, and whether any existing disagreements were merely technicalities). While MEMC may have developed some discontent with some or all of the terms of the Term Sheet or with subsequent discussions relating to the drafting thereof, the fact that a party decides after the fact that a contract is not to its liking does not provide a reason to suppose that a contract was not in fact formed or to release that party from its obligation. Visiting Nurse Ass'n, 347 F.3d at 1055 (citing Worthy v. McKesson Corp., 756 F.2d 1370, 1373 (8th Cir. 1985) (per curiam)).

For all of the foregoing reasons, the Court finds that plaintiff has met its burden of demonstrating by clear, convincing and satisfactory evidence that a binding settlement agreement was reached between the parties on November 22, 2007, upon plaintiff's unconditional acceptance of defendants' offer of settlement as set

out in the Proposed Settlement Term Sheet delivered on November 20, 2007.  The Proposed Settlement Term Sheet offered by defendants on November 20, 2007, and accepted by plaintiff on November 22, 2007, contains all the material and essential terms of the agreement and acknowledges that only the matter of drafting a proper release remained to be addressed.  There is no indication in this settlement offer, or in its acceptance, of any clear intent not to be bound in the absence of a written agreement.  Subsequent disagreements do not negate the fact that an enforceable agreement was reached on November 22, 2007.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff Semi-Materials's Motion to Enforce Settlement (Docket No. 46) is granted.

**IT IS FURTHER ORDERED** that plaintiff Semi-Materials Co., Ltd., and defendants MEMC Electronic Materials, Inc., and MEMC Pasadena, Inc., shall comply with the provisions of the Term Sheet as agreed to between the parties on November 22, 2007.

In accordance with said terms and in consideration of the passage of time,

**IT IS FURTHER ORDERED** that within ten (10) business days of the date of this Order, Semi-Materials shall pay MEMC for the shipment of the first fifty (50) metric tons of polysilicon described in the Term Sheet (_i.e._, forty (40) metric tons of granular polysilicon and ten (10) metric tons of PX chunk

polysilicon) at a price of Three Hundred Seventy and 00/100 Dollars (US $370) per kilogram and that MEMC shall ship this fifty (50) metric tons of polysilicon to Semi-Materials within five (5) business days after receipt of such payment.

**IT IS FURTHER ORDERED** that subsequent payments for and shipments of polysilicon shall be made in accordance with the schedule set forth in the Term Sheet beginning with the shipments for the first quarter of 2008.

**IT IS FURTHER ORDERED** that Semi-Materials and MEMC shall otherwise perform and comply with their duties and obligations pursuant to the Term Sheet.

**IT IS FURTHER ORDERED** that the Court shall retain jurisdiction to enforce the terms of the settlement agreement as embodied in the Term Sheet until all provisions thereof have been satisfied.

**IT IS FURTHER ORDERED** that plaintiff Semi-Materials's Motion to Expedite Action on Plaintiff's Motion to Enforce Settlement (Docket No. 48) is denied as moot.



UNITED STATES MAGISTRATE JUDGE

Dated this __17th__ day of March, 2008.